**CONTINENTAL CASUALTY COMPANY,**
**Defendant-Appellant,**

v.

**Charles A. NOVY, M.D.,**
**Plaintiff-Appellee.**

No. 3–779A185.

Court of Appeals of Indiana,
Third District.

June 29, 1982.

William E. Borror, Hunt, Suedhoff, Borror, Eilbacher & Lee, Fort Wayne, for defendant-appellant.

Thomas S. Locke, James A. Federoff, Fort Wayne, for plaintiff-appellee.

GARRARD, Judge.

Dr. Charles A. Novy began practicing medicine in Garrett, Indiana in 1951. He was engaged in a general practice of medicine, which included obstetrics, routine surgery, the setting of fractures, and the administering of anesthetics.

In 1966 Continental Casualty Company offered an occupational disability policy to members of the Indiana State Medical Association. Dr. Novy sent in an application for coverage and Continental accepted him as an insured. The doctor received a five year accident and two year sickness occupational disability policy providing for monthly benefits of $800 in the event of disability.

In February of 1967 Novy's hands became excessively dry and the skin began to crack open. Novy consulted with a dermatologist who diagnosed the condition as radiodermatitis, an injury resulting from exposure to x-rays. The exposure to such radiation oc-

curred in the course of Novy's practice. Dr. Novy had used a fluoroscope to x-ray fractures while he set them, and in so doing he had repeatedly exposed his hands to the x-rays. Upon discovering the source of his affliction the doctor ceased all work with x-rays. However, the effects of the exposure to radiation were irreversible and the problems with his hands worsened. The doctor testified that in late 1967 his hands began to stiffen, forcing him to give up the surgical and obstetrical procedures in his practice.

In 1969 an ulcer developed on the back of the doctor's right hand, for the treatment of which he consulted with a doctor at the Cook County Hospital burn unit in Chicago. Medication healed the ulcer but substantial scar tissue remained.

In August of 1970 Continental proposed an increase in coverage and benefits for the doctor. Continental offered him increased benefits of $1000 a month on his occupational disability policy and additional coverage under a general disability policy. In his application Novy advised Continental that he had physical difficulties with his hands, stating in the application that he had radiodermatitis of his right hand which was being treated and was improving. Continental then issued the doctor the two policies discussed below, but attached an elimination endorsement to each policy. The elimination endorsements provided that any loss caused or contributed to by "skin disorder" would be excluded from the increased benefits. The maximum indemnity payable under either policy for loss attributable to the skin disorder was $800 a month, the same amount as provided for in the initial policy entered into in 1966. Under these terms Novy tendered his premiums.

In November of 1970 Novy underwent surgery on his right hand. A skin graft was made to correct scar tissue left from the ulceration suffered in 1969. During the period that he was absent from his practice due to the skin grafting, he applied for and received benefits of $800 a month from Continental Casualty.

In April of 1971 the graft healed and Novy returned to his practice. He described his activities as seeing patients and giving anesthetics. However, he did not perform surgery, obstetrics, or anything in which he would have had to use his hands "in a delicate way."

Throughout 1971 the condition of the right hand continued to deteriorate. Warty growths and ulcers developed on the joints of the fingers of the right hand.

In February of 1972 Continental again offered the doctor increased benefits. The doctor elected to increase the indemnity payable to $1,200 a month on both policies. In his application the doctor stated that he had chronic radiation burns on his right hand. The policies returned by Continental contained elimination endorsements identical to those in the policies issued in 1970.

Also in 1972 Novy consulted with a plastic and reconstructive surgeon, Dr. Brucker. The diagnosis was that the condition of the right hand had so deteriorated that the amputation of the middle and ring finger was necessary. In September of 1972 the two fingers were amputated. Also, the index finger was grafted to the abdominal wall in an effort to reduce the ulceration on that finger. The index finger was removed from the abdominal wall several weeks later. Further revisionary work was done on the stumps of Novy's fingers in March of 1973. Throughout this period the doctor was not practicing. He applied for and was receiving benefits of $800 a month from Continental.

In April of 1973 Novy reopened his practice, although he did not notify Continental. At this point his right hand was essentially useless and the left hand was beginning to stiffen. He described his activities as a winding down of his practice, getting patients' records together and referring them to other doctors. An agent of Continental discovered that Novy was working and the benefits were halted. In December of 1973 Novy closed his practice.

In January of 1974 he became employed as a staff physician at the Veterans Administration Hospital in Fort Wayne. He de-

scribed the duties of the position as the treatment, examination and diagnosis of patients. He was not authorized or capable of doing surgical procedures and he could not tolerate the scrubbing and cleansing process required for any sterilized procedure. He worked in this capacity at the V.A. Hospital until the summer of 1978, when he took a sick leave.

In April of 1977 the doctor filed suit against Continental, alleging that it was in breach of contract for failure to pay him disability benefits to which he was entitled. Trial without a jury was commenced on July 11, 1978. On November 15, 1978 the court made its first special findings of fact, conclusions of law and judgment, to which both parties filed motions to correct errors. The court denied both motions but amended its special findings of fact, conclusions of law and judgment. The court found that under the terms of the policies Dr. Novy was disabled and entitled to benefits of $1200 a month for as long as he was so disabled. Both parties again filed motions to correct errors, which were overruled.[1] This appeal followed.

The appellant Continental raises these issues:

1. Whether the trial court's judgment awarding the plaintiff benefits under either of the insurance policies for an "injury" occurring prior to the effective dates of the policies was contrary to law and not supported by the evidence.

2. Whether the judgment of the trial court was contrary to law and not supported by the evidence in regard to Dr. Novy being "disabled" within the meaning of the "occupational" disability insurance policy.

3. Whether the judgment of the trial court was contrary to law and not supported by the evidence in regard to Dr. Novy being "disabled" within the meaning of the "total" disability insurance policy.

4. Whether the decision of the trial court that the "elimination endorsement" was inapplicable was contrary to law and not supported by the evidence.

5. Whether the trial court committed reversible error in refusing to grant the defendant a new trial under Indiana Rules of Procedure, Trial Rule 59(A)(6) because of newly discovered evidence, which evidence was not available at the time of trial.

6. Whether the judgment of the trial court as it relates to plaintiff being under the "regular care and attendance of a currently licensed physician or surgeon, other than the insured," a condition precedent to recovery under the policies, was contrary to law and not supported by the evidence.

The appellee Novy on cross appeal raises these issues:

1. Whether the decision of the trial court, in finding plaintiff/cross-appellant was not entitled to punitive damages, was contrary to law?

2. Whether the decision of the trial court in failing to award plaintiff/cross-appellant prejudgment interest at the statutory rate from the date of his claim for benefits under the policies to the date of judgment was contrary to law?

The doctor's suit was based upon breach of contract. Novy alleged that Continental had failed to perform its obligations under the insurance contracts. The occupational disability policy, referred to as Exhibit 1 by the trial court, was first issued in 1966. The policy, in relevant part, stated that Continental Casualty Company:

"HEREBY INSURES CHARLES A. NOVY, M.D. of Garrett, Indiana (herein called the Insured) and, subject to all the provisions, definitions, limitations and conditions of the policy, promises to pay indemnity for loss covered by this policy resulting from injury or sickness in the manner and to the extent herein provided.

---

1. In *Breeze v. Breeze; Continental Casualty Co. v. Novy* (1981), Ind., 421 N.E.2d 647, the Supreme Court found that under TR 59 "a praecipe is timely if filed within thirty days of the ruling on the second motion to correct

error." *Id.* at 650. This resolved a timeliness issue arising in Continental's appeal, which we had addressed in *Continental Cas. Co. v. Novy* (1979), Ind.App., 397 N.E.2d 294.

'Injury' wherever used in this policy means bodily injury caused by an accident occurring while this policy is in force, and resulting in loss. 'Sickness' wherever used in this policy means sickness or disease which causes disability commencing while this policy is in force.

\* \* \* \* \* \*

## Part II.
## MONTHLY ACCIDENT INDEMNITY

A. Indemnity will not be paid under this Part unless the disability either (1) commences while this policy is in force or (2) commences after the Company refuses to renew this policy but less than thirty-one days from the date of the accident occurring while the policy was in force.

B. Indemnity will not be paid under this Part for any period of disability during which the Insured is not under the regular care and attendance of a currently licensed physician or surgeon, other than the Insured, nor for any period of disability prior to the expiration of the Elimination Period Accident, if any, stated in the Schedule. When the Elimination Period Accident stated in the Schedule is "None," indemnity will also be payable under Paragraph D for periods of disability commencing within thirty days after the date of the accident.

C. When, as the result of injury, the Insured is wholly and continuously disabled and prevented from performing the duties of his occupation, the Company will pay periodically the Monthly Indemnity stated in the Schedule for each month the Insured is so disabled, not to exceed sixty consecutive months as the result of any one accident.

D. When injury, commencing immediately following a period of total disability for which indemnity is payable under Paragraph C of this Part, continuously disables and prevents the Insured from performing one or more important daily duties pertaining to his occupation, the Company will pay periodically one-half of the Monthly Indemnity stated in the Schedule for the period of such disability, not to exceed forty-five consecutive days as the result of any one accident.

## Part III.
## MONTHLY SICKNESS INDEMNITY

Indemnity will not be paid under this Part for any period of disability during which the Insured is not under the regular care and attendance of a currently licensed physician or surgeon, other than himself, nor for any period of disability prior to the expiration of the Elimination Period Sickness stated in the Schedule.

When sickness wholly and continuously disables and prevents the Insured from performing the duties of his occupation the Company will pay periodically the Monthly Indemnity stated in the Schedule for each month the Insured shall be so disabled, not to exceed twenty-four months as the result of any one sickness.

Successive periods of disability, due to the same or related causes, not separated by return to active full-time practice or employment for six months or more shall be considered as one period of disability."

The last page of the policy contained this provision:

### ELIMINATION ENDORSEMENT

It is agreed that in the event of loss caused or contributed to by _____ SKIN DISORDER _____

any _____ MONTHLY _____ Indemnity otherwise payable under this policy shall be paid as provided therein except that the _____ MONTHLY _____ Indemnity provided in the policy is reduced to $ _____ 800.00 _____

CONTINENTAL CASUALTY COMPANY

GR 7934 John A. Huery
 *President*

The general disability policy, referred to as Exhibit 2, was first effective in 1970 and provided that Continental Casualty Company:

"HEREBY INSURES the person named in the Schedule (herein called the Insured) and subject to all the provisions, definitions, limitations and conditions of the policy promises to pay indemnity for loss covered by this policy resulting from injury or sickness in the manner and to the extent herein provided.

## DEFINITIONS

'Injury' wherever used in this policy means bodily injury caused by an accident occurring while this policy is in force, and resulting in loss. 'Sickness' wherever used in this policy means sickness or disease which causes disability commencing while this policy is in force.

\* \* \* \* \* \*

## Part II.

### MONTHLY ACCIDENT INDEMNITY

Indemnity will not be paid under this Part unless the disability either (1) commences while this policy is in force or (2) commences after the Company refuses to renew this policy but less than thirty-one days from the date of the accident occurring while the policy was in force.

Indemnity will not be paid under this Part for any period of disability during which the Insured is not under the regular care and attendance of a currently licensed physician or surgeon, other than the Insured, nor for any period of disability prior to the expiration of the Elimination Period Accident stated in the Schedule.

"When, as the result of injury, the Insured is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience, the Company will pay periodically the Monthly Indemnity stated in the Schedule for each month the Insured shall live and be so disabled.

## Part III.

### MONTHLY SICKNESS INDEMNITY

Indemnity will not be paid under this Part for any period of disability during which the Insured is not under the regular care and attendance of a currently licensed physician or surgeon, other than himself, nor for any period of disability prior to the expiration of the Elimination Period Sickness stated in the Schedule.

When sickness wholly and continuously disables and prevents the Insured from performing the duties of his occupation, the Company will pay periodically the Monthly Indemnity stated in the Schedule for each month the Insured shall be so disabled, not to exceed thirty-six months as the result of any one sickness.

After the payment of Monthly Indemnity for thirty-six months as aforesaid, the Company will continue the periodic payment of such Monthly Indemnity for so long as the Insured shall be wholly and continuously disabled by reason of said sickness and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience, until the date of the Insured's sixty-fifth birthday.

Successive periods of disability, due to the same or related causes, which are separated by return to active full-time employment for six months or more shall be considered new periods of disability and subject to the Elimination Period Sickness stated in the Schedule."

Again, the last page of this policy contained this provision:

### ELIMINATION ENDORSEMENT

It is agreed that in the event of loss caused or contributed to by _____SKIN DISORDER_____ any _____MONTHLY_____ Indemnity otherwise payable under this policy shall be paid as provided therein except that the _____MONTHLY_____ Indemnity provided in the policy is reduced to $ __800.00__

CONTINENTAL CASUALTY COMPANY

GR 7934 John A. Huery
*President*

### ISSUE 1:

In its findings of fact and conclusions of law the trial court found:

"... that the testimony of Dr. Boswich and Dr. Brucker as well as the diagnosis of Dr. Haffner is unqualified that Novy is suffering from a radiation injury or burn and not from sickness."

"That Plaintiff's condition is an injury or disability entitling [him] to the payment of indemnity under Part II of Plaintiff's Exhibit 1 and Part II of Plaintiff's Exhibit 2."

and that "Novy is entitled to be paid the monthly accident indemnities under the policies ...."

■ Thus the award of benefits was based upon the trial court's determination that Novy's disability resulted from injuries and not from a sickness. Continental argues on appeal that the court's determination was contrary to law because the injuries occurred prior to the effective dates of the policies and therefore were not covered. Both policies provided that indemnity would be paid only for injuries[2] occurring *after* the coverage under the policies commenced. Continental asserts that the injuries which caused the doctor's afflictions were preexisting conditions which antedated the effective dates of both policies. Thus Continental argues that the terms of the policies preclude recovery because the injuries were suffered prior to the effective dates of the policies.

Novy argues that Continental's contentions do not warrant our consideration for two reasons. He first asserts that Continental has failed to comply with Indiana Rules of Procedure, Appellate Rule 8.3(A)(7) in that Continental has failed to present a cogent argument and has failed to cite to proper authority for its contentions. Second, Novy asserts that Continental has waived the issue because it was not put forth at trial. We accept Novy's second argument. We have reviewed the record and find that Continental failed to raise the argument at trial and it was therefore waived. The argument was not raised as an issue in the pretrial order nor in defendant's proposed findings. Only in its amended motion to correct errors did the appellant put forth this argument that the coverage was not available because the injury occurred prior to the effective date of the policies. In *Van Bibber v. Norris* (1980), Ind.App., 404 N.E.2d 1365, 1382 (reversed in part on other grounds) Judge Young stated:

"Generally speaking, a defendant has the burden to put his defense in issue. *Rogers v. State* (1978), 267 Ind. 654, 373 N.E.2d 125, 127. A defendant can do this by presenting the appropriate pleadings and evidence. *Id.; see* Ind. Rules of Procedure, Trial Rule 8(C). The Van Bibber defendants cannot overthrow the judgment on the basis of an argument or issue which they never clearly disclosed to the trial court. *Health & Hospital Corp. of Marion Cnty. v. Gaither* (1979), Ind., 397 N.E.2d 589, 593; *Dunn v. Jenkins* (1978), Ind., 377 N.E.2d 868, 877; *Indiana Aeronautics Comm'n v. Ambassadair, Inc.* (1977), 267 Ind. 137, 368 N.E.2d 1340, 1347. This discussion points out that the Van Bibbers have raised this argument for the first time in their motion to correct errors. This is too late. *Jacks v. State* (1979), Ind., 394 N.E.2d 166, 173; *Johnson v. State* (1979), Ind., 390 N.E.2d 1005, 1009. Because the argument on issue was not raised until after trial the Van Bibbers waived it."

Consequently, as Continental failed to put the argument at issue at trial, the issue was waived.

Continental raises another issue on appeal, but again one which it failed to raise at trial. It now argues that the general disability policy was not effective until 1970 and that the policy specifically stated that it would cover only those injuries or sicknesses commencing while the policy was in effect. The initial stages of the affliction were apparent by 1967 and therefore the general disability policy is not applicable at all, so argues Continental. However, Continental cannot now make this contention for the first time on appeal. Thus the appellant has waived any argument that Novy is not entitled to benefits based upon the allegation that injuries occurred prior to the effective date of either policy.

**2.** The two policies contained the following proviso:

"'Injury' wherever used in this policy means bodily injury caused by an accident occurring while this policy is in force, and resulting in loss. 'Sickness' wherever used in this policy means sickness or disease which causes disability commencing while this policy is in force."

ISSUE 2:

The trial court ruled that under the accident provisions of these policies, Novy was entitled to an indemnity of $1200 a month for as long as he was disabled. The court found that under the occupational disability policy Novy was "wholly and continuously disabled and prevented from performing the duties of his occupation and entitled to benefits under said policy payable at the rate of Twelve Hundred Dollars ($1,200.00) per month for a period of sixty (60) months beginning November, 1972 and ending in October, 1977 . . . ." and that under the general disability policy, "Novy has been and is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience and is entitled to benefits thereunder payable at the rate of Twelve Hundred Dollars ($1,200.00) per month commencing November, 1977 and continuing for each month thereafter that Novy shall live and be so disabled."

Continental asserts that the court's judgment that Novy was disabled under the occupational disability policy is contrary to law and not supported by the evidence.

The occupational disability policy provided for benefits "when, as the result of injury, the Insured is wholly and continuously disabled and prevented from performing the *duties of his occupation* . . . ." Pursuant to the policy, the trial court found that Novy was "wholly and continuously disabled and prevented from performing the duties of his occupation beginning in November of 1972 . . . ."

The trial court made its judgment on this matter based upon the following findings:

"8. That at the time Novy made his application for said policies of insurance, and on the effective dates thereof, CNA[3] or its duly authorized agents were aware that Novy was engaged in the practice of medicine as a general practitioner; that Novy sought insurance from CNA

against the risk of his disability, either from accident or sickness, to engage in the practice of medicine as a general practitioner in the City of Garrett in the rural area of DeKalb County, Indiana, and CNA contracted to insure Novy, as such general practitioner at such or similar location against a covered disability that would prevent Novy from the pursuit of such practice.

\* \* \* \* \* \*

11. . . . [T]hat Novy is entitled to be paid the monthly accident indemnities under the policies in issue by reason of his inability to exercise that degree of skill which is ordinarily possessed by general medical practitioners in performing medical diagnostic and treatment services in similar localities to that in which Novy engaged in his chosen profession."

Further, the trial court made the following conclusions of law:

"3. That under Part II C of the Contract of Insurance between the Plaintiff and Defendant identified as Plaintiff's Exhibit 1, as the result of radiation injury and resulting radiodermatitis which has degenerated into osteoradionecrosis, the Plaintiff is wholly and continuously disabled and prevented from performing the duties of his occupation.

\* \* \* \* \* \*

11. That under the terms of the policy for disability insurance submitted into evidence as Plaintiff's Exhibit 1, Novy has been wholly and continuously disabled and prevented from performing the duties of his occupation and entitled to benefits under said policy payable at the rate of Twelve Hundred Dollars ($1,200.00) per month for a period of sixty (60) months beginning November, 1972 and ending in October, 1977; that CNA is entitled to a credit against the entitlement of Novy under Plaintiff's Exhibit 1 in the amount of Four Thousand Four Hundred Dollars ($4,400.00) for disability benefits previously paid by CNA to Novy

---

**3.** CNA is the parent company of Continental Casualty. While we refer to the insurer as Continental, the court has used the designation of CNA.

from November, 1972 through March, 1973."

The record reveals that from April of 1973 until the end of 1973 Novy was conducting a limited practice of medicine in Garrett. He closed the practice in December of 1973. In January of 1974 he became employed as a full time staff physician at the V.A. Hospital in Fort Wayne and continued in that position until the summer of 1978. The issue was not whether Novy was employed during the period. Rather, the matter in dispute at trial was whether Novy was performing the duties of his occupation during this period. Thus the crux of the issue is: What occupation was Novy insured against the loss of?

Novy, on his initial application for insurance in 1967, listed his occupation as "physician and surgeon." Continental asserts that it thus insured Novy as a "physician and surgeon" and that Novy was thus employed, at least as a physician, through the summer of 1978. Novy contends, as the trial court found, that his insured occupation was that of a general practitioner in Garrett, Indiana and that he was therefore occupationally disabled because he could no longer perform the tasks required of a general practitioner in Garrett. Thus, an apparent ambiguity exists as to the meaning of "occupation."

In construing the terms of an insurance policy to resolve a dispute between insurer and insured, we are mindful of several rules of construction:

"An 'ambiguity' exists in an insurance contract when it is susceptible to more than one interpretation. In order to constitute such an ambiguity, it must be shown that reasonably intelligent men would honestly differ as to the contract's meaning. However, this does not mean an ambiguity exists simply because a controversy exists between parties, each favoring an interpretation contrary to the other's. *O'Meara v. American States Insurance Company* (1971), 148 Ind.App. 563, 268 N.E.2d 109. When construing an insurance contract, we seek to ascertain and effectuate the intent of the parties to

the contract. If there is no ambiguous language in a policy, this goal is accomplished by giving a policy's terms their plain, usual, ordinary, meaning. *Meridian Mutual Ins. Co. v. Gulf Ins. Co.* (1977), Ind.App., 366 N.E.2d 190. We also must consider all of a policy's provisions in determining its meaning. *Taylor v. American Underwriters, Inc.* (1976), Ind. App., 352 N.E.2d 86."

*Northland Insurance Company v. Crites* (1981), Ind.App., 419 N.E.2d 164, 167.

The occupational disability policy does not contain a definition of "occupation." The trial court has interpreted "occupation" to mean that activity in which Novy was substantially engaged at the time when he became an insured of Continental. This interpretation focuses upon the particular facts of this case, which are that within the medical profession Novy's individual occupation was that of a general practitioner of medicine. Continental contends that Novy's occupation is indelibly fixed under the broad categories of "physician and surgeon" since that is how he responded on his applications for the policies.

█ We believe that Novy could reasonably have assumed that he was being insured against the loss of his form of practice in Garrett under the occupational policy. When he became insured in 1966 he had been engaged in the general practice in Garrett since 1951. The policy Continental was offering to Novy insured him against the loss of his occupation. The policy did not specify that it was insuring him against the loss of anything *other than* his general practice in Garrett. Nor do we believe that the application put Novy on notice that the routine completion of that form would have such binding legal effect. Thus, we believe that the determination of what was Novy's occupation depends upon the facts of the case and rules of interpretation.

In arguing that Novy was not occupationally disabled, Continental cites *Mutual Life Insurance Co. of New York v. Tormohlen* (7th Cir. 1941), 118 F.2d 163, wherein the court stated:

"We think it is now well settled under the laws of Indiana that total disability, under insurance policies containing provisions such as are here involved does not mean absolute physical inability or complete helplessness to transact any kind of business. *The test is whether the condition of the insured is such as to prevent him from transacting all kinds of work pertaining to his occupation or profession. Commercial Travelers, etc. vs. Springsteen*, 23 Ind.App. 657, 55 N.E. 973; *American Liability Co. vs. Bowman*, 65 Ind. App. 109, 114 N.E. 992; *Great Northern Cas. Co. vs. McCullough*, 96 Ind.App. 506, 174 N.E. 103; *Metropolitan Life Ins. Co. vs. Schneider*, 99 Ind.App. 570, 193 N.E. 690; *Aetna Life Ins. Co. vs. Huffstetter*, 101 Ind.App. 355, 195 N.E. 598 and *Prudential Ins. Co. vs. Girton*, 105 Ind.App. 52, 12 N.E.2d 379." (Emphasis Supplied). 118 F.2d at 166.

The issue in *Tormohlen* was whether the doctor was *totally* disabled within his profession, whereas here the issue is whether Novy was occupationally disabled under the terms of this particular policy. Thus we do not find that *Tormohlen* is appositive in this particular case. Appellant also cites an Arkansas case, *Aetna Life Insurance Co. v. Orr* (1943), 205 Ark. 566, 169 S.W.2d 651, which dealt with benefits under a doctor's total disability policy. In that case a doctor was practicing as a physician and surgeon when he suffered x-ray burns on his right hand. Under two separate policies the trial court adjudged that the doctor was totally and permanently disabled under a *total* disability policy providing benefits whenever because of injury he was prevented from performing *any* work or conducting any business for compensation or profit. *Id.* 169 S.W.2d at 652. The Supreme Court of Arkansas reversed, holding that Orr had two occupations, physician and surgeon, and that he had to be unable to pursue both occupations before he could recover under the total disability policy. Since the doctor was seeing patients from which he derived

income, he was not totally disabled, even though he could no longer engage in surgery. Again we note that the policy in *Orr* was a *total* disability policy, whereas the present issue is whether Novy was entitled to recover under an occupational disability policy.

The appellee Novy cites several cases where physicians who were unable to continue their particular occupations were awarded occupational disability benefits even though they were still involved in the field of medicine.[4] In *Dixon v. Pacific Mutual Life Insurance Co.* (2nd Cir. 1959), 268 F.2d 812, the insured was a doctor of medicine who had a non-cancellable income policy of insurance against disability for injury or sickness resulting in loss of business time. In that policy the doctor's occupation was listed as "physician and surgeon." The facts disclosed that the doctor had specialized in surgical procedures as his practice developed. The doctor developed dermatitis of the hands. Although the dermatitis was not cured, it was alleviated when the doctor did not engage in sterilization techniques. The doctor gave up his surgical practice and became employed in a Veteran's Hospital where:

"The work was somewhat analogous to that of a hospital superintendent. Although plaintiff was technically practicing medicine in both positions (the positions required a licensed doctor), he did not examine, diagnose or treat patients except for an occasional sprain or bruise." 268 F.2d at 814.

On this point, the duties of Novy and the doctor in *Dixon* differed in their respective positions within the Veteran's Hospital. Novy did do routine diagnostic work within the restriction imposed by the limited dexterity of Novy's hands. However, we do not believe that this difference requires distinguishing the court's analysis in *Dixon* from the facts of the present case. On whether the doctor therein was occupationally disabled, the *Dixon* court stated:

---

4. *See* 21 A.L.R.3d 677 for a compilation of cases dealing with "what constitutes total or permanent disability within the meaning of insurance policy issued to physician or dentist."

"By simple logic, at first impression most compelling, defendant argues that it insured plaintiff as a physician and surgeon; that plaintiff's positions at the Veterans Hospitals could only have been filled by a licensed physician; and that, therefore, he was still functioning as a physician and hence not totally disabled. Quite frequently, however, cold logic can be most unrealistic. Carried to extremes, · it could be asserted that so long as plaintiff retained his license to practice he was not totally disabled. The policy and the word 'occupation' cannot be so narrowly construed. *Occupation is the occupation of the individual policyholder. It is the ability to continue in his particular occupation for which he seeks protection by insurance. If his occupation has become that of a recognized specialist in surgery and he suffers from a physical impairment or disease which causes an uncontrollable tremor of the hands or an infection, such as dermatitis, resulting in the forced discontinuance of his practice for all practical purposes there is total disability. He can no longer pursue his real occupation. Against this possibility he may seek insurance protection.*

Over the last several decades there has been an increasing tendency in the field of medicine to specialize. Even in surgery there are many fields. If a physician has spent his life as a neurosurgeon or an opthalmic surgeon he is effectively deprived of his occupation if illness prevents his continuing in that particular field. Technically he is still a physician and theoretically an insurance company could argue that an affliction which would disqualify him from surgery would not prevent him even at advanced years from becoming a general practitioner. Defendant amassed much evidence tending to prove that the qualifications for plaintiff's Veteran Hospital positions called for a physician. The trial court admitted this evidence and permitted the jury to decide whether plaintiff was able to pursue the occupation of 'Physician and Surgeon' as defined in the policy. The trial court instructed the jury that the policy was 'to be construed by giving such meaning to the terms used as would be ascribed to them by the average man in applying for the insurance and reading the language of the policy at the time it was written;' that they were not to revise the policy or increase defendant's risk; and that they were to decide 'whether the plaintiff and defendant intended that the type of work to be covered by this policy included the work plaintiff has been doing in the Veterans Administration hospitals.' The jury's answers to the court's written questions were amply sustained by the evidence and there was no error in denying defendant's motions to dismiss or for judgment notwithstanding the verdict.

The two Arkansas cases construing the same type of policy issued by defendant do not require the setting aside of the jury's verdict. In *Aetna Life Ins. Co. v. Orr (Pacific Mutual Life Ins. Co. v. Orr)*, 1943, 205 Ark. 566, 169 S.W.2d 651, the doctor practiced both as a physician and surgeon. His practice as a physician continued in substantial volume. The error was in the court's charge in the light of the particular facts. *Franklin Life Ins. Co. v. Burgess*, 1952, 219 Ark. 834, 245 S.W.2d 210, merely recognized the theory of 'dual professions' as stated in the *Orr* case."

268 F.2d at 815–16.

Thus the *Dixon* court was recognizing that each individual has a "particular" or "real" occupation against the loss of which an insured may seek protection. Even though he was a physician and surgeon, the doctor's real occupation was a surgeon, and because he could no longer perform the requisite skills of a surgeon, he was no longer able to pursue the occupation for which he was insured. Therefore he was disabled under the terms of the policy.

We follow the court's reasoning in *Dixon*, that within one's profession, i.e., that of a licensed physician, an insured may have a particular occupation in which he is concentrating his efforts and skills to the exclusion of other branches of his medical profes-

sion. Novy had established himself as a general practitioner in Garrett, and that was his occupation at the time he became an insured of Continental, the loss of which he desired to be protected against by insurance. To hold that Novy was occupationally employed so long as he was a licensed physician would in effect deny him coverage except under the most dire circumstances. That was not the intended effect of the contract.

Nor is *Dixon* the only case supporting Novy's position. In *Niccoli v. Monarch Life Insurance* (1972), 70 Misc.2d 147, 332 N.Y. S.2d 803, the court was faced with the following facts:

"The plaintiff is a physician and surgeon, specializing in the private and hospital practice of obstetrics and gynecology. He brings this action to recover the sum of $10,677.34 under a policy of health and accident insurance issued to him by the defendant company in 1964. The policy entitled plaintiff to receive $770 per month for 24 months during any period when he was totally disabled. Total disability was defined in the contract as occurring whenever plaintiff suffered '. . . complete inability to engage in his regular occupation.' In February 1967 the plaintiff suffered a heart attack and was compelled to discontinue his specialized practice. After his recovery, he accepted employment as the director of family planning and sex education for Coney Island Hospital. In the new position plaintiff used the skills and knowledge which he possessed as a physician and surgeon but no longer performed surgery or obstetrics.

\*　　\*　　\*　　\*　　\*　　\*

The defendant contends that, as a matter of law and fact, the plaintiff was not totally disabled from engaging in his regular occupation as a physician and surgeon, because he continued to use his medical skills and knowledge in his new occupation as the director of a hospital family planning and sex education unit. Defendant claims that the plaintiff was still engaged in his chosen profession be-

cause he participated in gynecological clinics and occasionally made medical diagnoses. The defendant points to the fact that plaintiff earned more in his new job than he did before his heart attack." 332 N.Y.S.2d at 804–5.

A jury returned a verdict in favor of the doctor. In affirming the verdict the court stated:

"Health and accident insurance policies are usually designed to indemnify against loss of capacity to work, not against loss of income (*Continental Casualty Co. v. Carlisle,* Tex.Civ.App., 391 S.W.2d 98; *Bachman v. Travelers' Ins. Co.,* 78 N.H. 100, 97 A. 223, 227; 6 Cooley, *Briefs on Ins. 2d* 5536). Therefore plaintiff's larger income from a new occupation will not bar recovery under his disability policy.

Disability provisions in insurance policies generally fall into two categories: the 'occupational,' which indemnifies the assured when he becomes disabled from performing substantially all the material acts necessary to his chosen profession (Ann. 21 A.L.R.3d 681; 31 N.Y.Jur. Insurance § 1373, p. 205); and the 'general' which indemnifies the policyholder when he becomes totally incapable of following any occupation for profit (15 Couch, Insurance, 2d § 53.45).

This case requires the interpretation of an occupational indemnity policy. By the terms of its contract, the company undertook to make cash monthly payments to the assured when it was established that he had become completely unable to engage in his regular occupation.

The law is clear that contracts of insurance, like other contracts, are to be construed according to the plain sense and ordinary meaning of the terms used by the parties (*cf. Preston v. Aetna Ins. Co.,* 193 N.Y. 142, 144, 85 N.E. 1006, 1007). Such contracts must be reasonably construed; not according to the interpretations of scientists but the concepts of average men (*cf. Lewis v. Ocean Accident and Guarantee Corporation, Limited of London, England,* 224 N.Y. 18, 20, 21, 120 N.E. 56, 57); and given practical applica-

tion (*cf. Williams v. John Hancock Mutual Life Ins. Co.* 245 App.Div. 585, 587, 283 N.Y.S. 87, 89). A stricter rule of law than this is applied to protect insured persons. New York courts have declared that '. . . the terms of an insurance policy will receive the construction most favorable to the insured (*Sperling v. Great Amer. Ind. Co.*, 7 N.Y.2d 442, 199 N.Y. S.2d 465, 166 N.E.2d 482) . . . .' (*Matter of Vanguard Ins. Co. and Chester Polchlopek*, 18 N.Y.2d 376, at p. 381, 275 N.Y.S.2d 515, at p. 520, 222 N.E.2d 383, at p. 386; *Bachrach v. Mutual of Omaha Ins. Co.*, 38 A.D.2d 897, 898, 329 N.Y.S.2d 238, 240). Occupational disability policies are devised and sold by insurance companies to protect individuals when they are disabled from pursuing their particular occupations. The courts of this state have uniformly held that total disability in particular occupations occurs when the assured is found to be incapacitated from performing any substantial part of his ordinary duties, notwithstanding that he can still perform some of the duties pertinent to his profession (*cf. Neafie v. Manufacturers' Accident Indemnity Co.*, 55 Hun. 111, 8 N.Y.S. 202; *Harasymczuck v. Massachusetts Accident Co.*, 127 Misc. 344, 216 N.Y.S. 97, 100; *Collis v. Massachusetts Bonding & Ins. Co.*, 236 App.Div. 525, 260 N.Y.S. 241, *affd.* 264 N.Y. 447, 191 N.E. 507).

\* \* \* \* \* \*

There is ample evidence in this case to support the jury's finding that the plaintiff's occupation as consultant in sex education and family planning for Coney Island Hospital did not constitute the practice of medicine, far less the practice of gynecology and obstetrics. Handicapped as he was by the after-effects of a severe heart attack, the plaintiff was not called upon to abjure the use of his valuable medical knowledge, when he sought to rehabilitate himself. In fact he could reasonably be expected to make the maximum use of such skills as he possessed to rebuild his shattered life. This court will not give a strained interpretation to the contract, nor foreclose the physician from

the promised benefits of his contract because he has used some of his acquired knowledge and medical training in his new occupation. Lacking unequivocal language to such effect, this court will not compel an insured professional man to march backward toward obscurantism and ignorance in order to receive the benefits of a policy which he purchased to protect himself if he became incapable of practicing his chosen calling. The motion of the defendant for judgment notwithstanding the verdict of the jury is therefore denied."

332 N.Y.S.2d at 805, 809.

■ We agree with the reasoning of the *Dixon* and *Niccoli* courts. "Occupation" is the occupation of the individual policyholder. It is the ability to continue in his particular occupation for which he seeks protection by insurance. *Dixon* at 815. Thus the trial court reasonably concluded that Novy sought occupational disability insurance in order to protect himself against the loss of his general practice due to disability. The trial court's finding that Novy was occupationally disabled was supported by the evidence and was proper under the law.

ISSUE 3:

■ The trial court found that under the general disability policy Novy was entitled to $1,200 a month for as long as he was disabled, commencing in 1977 at the expiration of benefits available under the occupational policy. Continental argues that the trial court erred in finding Novy disabled under the general disability policy. The general disability policy provided:

"When as the result of the injury the insured is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training, or experience, the company will pay periodically the monthly indemnity stated in the schedule for each month the insured shall live and be so disabled."

The trial court found:

"That under the provisions of Part II of the insurance contract between the

parties which has been identified as plaintiff's Exhibit 2, the plaintiff has sustained a radiation injury with resulting radiodermatitis which has degenerated into osteoradionecrosis and is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training, or experience."

"That under the terms of the policy for disability income insurance admitted into evidence as plaintiff's Exhibit 2, Novy has been and is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience and is entitled to benefits thereunder payable at the rate of Twelve Hundred Dollars ($1,200.00) per month commencing November, 1977 and continuing for each month thereafter that Novy shall live and be so disabled."

In so holding, we believe that the trial court erred.

Continental argues that Novy was not generally disabled because he was able to work full time at the V.A. Hospital. We agree. While Novy was unable to continue his occupation as a general practitioner, the evidence shows that he worked from January 1974 until the summer of 1978 as a full time staff physician at the V.A. Hospital. His injuries did not prevent him from "engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience" since he was able to work as a staff physician at the V.A. Hospital.

In *Ross v. Farmers Insurance Exchange* (1971), 150 Ind.App. 428, 277 N.E.2d 29, 32, Judge Sharp, quoting *Jacobson v. Mutual Ben. Health & Accident Ass'n.* (1941), 70 N.D. 566, 296 N.W. 545, 552–3, noted the distinction between occupational and general disability policies:

"If the policy is of the 'occupational' type and undertakes to insure against disability to transact a certain business or to perform labor in a particular occupation in which the insured is engaged, the insured is 'wholly disabled' within the meaning of the policy if the infirmity resulting from the accidental injury is such as to render the insured unable to do all the substantial and material acts necessary to the prosecution of the insured's business, or in the carrying on of his occupation, and which acts he would be able to do and perform were it not for the disability. [citations omitted]

"If the policy is of the 'general' type and undertakes to insure against loss only in case the insured shall become 'wholly disabled' or 'totally disabled,' and there are no words limiting the disability to a particular business or occupation, the insured becomes 'wholly' or 'totally' disabled, within the meaning of the policy, if the infirmity occasioned by the accident in fact renders the insured unable to carry on any business, or remunerative vocation, which business or vocation the insured would be qualified, physically and mentally, to carry on if it were not for such infirmity. [citations omitted]"

277 N.E.2d at 32.

The general disability provision encompasses more than a disability in a particular occupation; it provides for indemnity only where the "Insured is wholly and continuously disabled and prevented from engaging in each and every occupation or employment for wage or profit for which he is reasonably qualified by reason of education, training or experience." Novy would be entitled to benefits under the policy if he were unable to pursue any gainful employment for which he was "qualified by reason of education, training or experience." Novy, however, was employed as staff physician at the V.A. Hospital from January of 1974 until the summer of 1978. While we recognize that Novy was no longer pursuing his occupation as a general practitioner, he was employed in his capacity as a licensed physician. We note that while so employed Novy was earning more than he did in his private practice. Therefore, we hold that a doctor of medicine is employed for wage or

profit for which he is reasonably qualified by reason of education, training or experience when he works full time as a staff physician at a V.A. Hospital.

ISSUE 4:

■ The trial court awarded benefits under both policies in the amount of $1,200 a month, the maximum allowable under the policies. The trial court found:

"6. That the Plaintiff is not disqualified from receiving benefits and indemnity under said policies of insurance because of any exclusionary portions of said policies or any elimination endorsement contained in either of said policies."

Continental asserts that the trial court erred in awarding an indemnity of $1,200 a month under either policy. It contends that the elimination endorsements on each policy put a ceiling of $800 a month on the benefits recoverable for disability arising from any skin disorder.

Both policies contained this provision, which had been added on the last page below the other terms of the contract:

ELIMINATION ENDORSEMENT

It is agreed that in the event of loss caused or contributed to by _____ SKIN DISORDER _____

any _____ MONTHLY _____ Indemnity otherwise payable under this policy shall be paid as provided therein except that the _____ MONTHLY _____ Indemnity provided in the policy is reduced to $ _____ 800.00 _____

CONTINENTAL CASUALTY COMPANY

John A. Huery

*President*

Continental argues that "skin disorder" includes radiodermatitis and its consequences. Apparently the trial court determined that the elimination endorsements were inapplicable because Novy's affliction was more acute than a skin disorder since it eventually caused the total impairment of the right hand, including the loss of two fingers.

The validity of the elimination endorsements is not at issue. At trial both parties stipulated that the policies, including the elimination endorsements, were valid and binding contracts of insurance.

The issue then is whether the effects of the radiation injury were excluded from the policies' coverage by the elimination endorsement. Continental argues that the elimination endorsement limiting benefits to $800 per month for disabilities resulting from "skin disorders" applied to the doctor's infirmities and that all parties understood that the endorsement was intended to eliminate any increased benefits where the doctor's pre-existing condition of radiation injury was concerned.

Novy contends that the elimination endorsements were not applicable to his affliction because the radiation injury affected substantially more of his hands than merely skin.

He argues that the phrase "skin disorder" should be construed to mean an "injury or disease affecting merely the skin" and not involving "the underlying bone, cartilage, tendons and ligaments." Therefore, since his affliction was so severe, in that it affected the blood vessels and bones of the hand, the elimination endorsements should not apply. Also, he argues that the term "skin disorder" was ambiguous and should be interpreted in his favor with the result that the elimination endorsements be disregarded.

We feel, however, that based on the facts before us the purpose and intent of the elimination endorsements was not ambiguous between the parties. The first occupational disability policy, issued in 1966, did not contain any exclusionary clause pertaining to skin disorders. Not until 1967 was Novy aware that he was suffering from radiodermatitis and Continental was not so notified until 1970. When Novy applied for the increased benefits and the general disability policy in 1970, he informed Continental that he was suffering from radiodermatitis. Continental's response was to attach the elimination endorsement covering the "skin disorder" to the policy which it returned to Novy. After receiving his policy the doctor tendered his premium, thus accepting Continental's offer to insure him. At trial the doctor acknowledged that he had seen the elimination endorsement.

Novy was asked, "You understood that the elimination endorsement applied to the condition of your hands that you told 'em about didn't you?" and Novy replied, "Yes, sir."

While Novy contends that he was placed in a "take it or leave it" situation when the policies were offered with the elimination endorsement, he apparently made no attempt to discuss the matter with Continental. If he was confused as to what the term "skin disorder" was intended to encompass, he did not make any effort to ascertain the intent of the clause by contacting Continental. Novy contends that if the elimination endorsements were held applicable here, the effect would be unconscionable. However, the exclusionary clauses do not deny Novy coverage. Rather, they limit the level of indemnity to that which Novy was first insured for in 1966. When the increased benefits were offered in 1970 and 1972, Novy was aware that he was suffering from radiodermatitis. He so informed Continental and the insurer froze the indemnity recoverable for disabilities from "skin disorders" at the 1966 level. We do not find any unconscionable results in holding that the elimination endorsements limit the recoverable indemnity to $800 a month in the present case for as long as the terms in the occupational disability policy so provide. As we discussed earlier, Novy was not entitled to benefits under the general disability policy; however, the elimination endorsement would have been applicable there also.

ISSUE 5:

■ Continental argues that it is entitled to a new trial on the basis of newly discovered evidence. On July 12, 1978 Novy filed a claim form with Continental, listing his occupation as "medical staff physician" and stating that he was unable to work as of June 2, 1978. Continental argues that such evidence conclusively shows that Novy was not disabled until June of 1978. In its motion to correct errors, filed December 20, 1978, Continental asked for a new trial on the basis of newly discovered evidence, the claim form filed by Novy in July of 1978.

"To demonstrate an abuse of discretion by the trial court in refusing to grant a new trial because of newly discovered evidence, Indiana law requires a showing that (1) the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced upon a retrial; and (9) that it will probably produce a different result."

*Tilton v. State* (1981), Ind.App., 416 N.E.2d 870, 873.

Any evidence that Novy considered himself employed through June of 1978 would not produce a different result at trial on the issue of whether Novy was occupationally disabled. That Novy worked at the V.A. Hospital was a clear fact at the time of trial. The dispute was whether he was occupationally disabled because he could no longer engage in private practice, and not whether he was employed at the V.A. Hospital. Thus the fact that Novy was contending that he was unable to continue his work at the V.A. Hospital in June of 1978 is not controlling upon whether Novy was occupationally disabled.

ISSUE 6:

Both policies provided that "Indemnity will not be paid under this Part for any period of disability during which the Insured is not under the regular care and attendance of a currently licensed physician or surgeon other than the Insured . . . ." Continental argues that Novy did not comply with this provision, which is a condition precedent to Continental's obligation to pay benefits.

In Finding 14 the trial court outlined Novy's treatment and found:

"... that since 1967, Novy has been under the regular care and attendance of a currently licensed physician or surgeon, other than the insured so as not [to] be excluded from benefits under the policies of insurance in question under Part II of

Plaintiff's Exhibit 2 and Part II B of Plaintiff's Exhibit 1."

And in Finding 15 the trial court stated:

"That Novy has in all respects been in full compliance with all conditions precedent to recovery as delineated in the insurance policies in issue in this cause and that none of the exclusions or elimination endorsements of said policies apply to defeat Novy's claim for damages and indemnity under said policies."

Continental asserts that from 1973 through 1976 Novy was not under the care of another physician. Assuming that Novy was not complying with the condition of being under the care of another physician, Continental argues that Novy was not entitled to indemnity. Continental contends that the language of the insurance policies is clear and unequivocal, and that the trial court "merely by stating 'compliance' cannot make it so in the face of the contractual language and undisputed evidence to the contrary." Therefore, according to Continental, the findings of the trial court are not supported by any evidence adduced at trial and therefore, are contrary to law.

The doctor acknowledged at trial that he did not formally consult another physician concerning the treatment of his hand from 1973 to 1976. However, he argues that he was in substantial compliance with the terms of this provision and that the evidence supports the trial court's finding to this effect. The evidence is that as the affliction degenerated, the physicians with whom Novy consulted determined that nothing could be done to arrest the effects of the radiation injury. Ointment was prescribed and used by the doctor in an attempt to alleviate the skin irritation but no other treatment was possible. Thus, periodic consultation with a physician would not have altered the deteriorating condition of Novy's hands.

In *Brown v. Continental Casualty Company* (1972), 209 Kan. 632, 498 P.2d 26, the insurer argued that the insured therein was not entitled to indemnity because he was not under the regular care and attendance of a currently licensed physician or surgeon.

The court affirmed the award of benefits in favor of the insured, holding in part that where the insured is otherwise entitled to benefits, and the policy contains such a clause, "such provision will not be enforced where it is shown by competent and substantial evidence that such attendance would be futile and no helpful purpose would be served thereby." *Id.* at 498 P.2d 32.

■ In the present case the evidence reveals that Novy suffered irreparable injuries from the exposures to radiation. Rather than undergoing treatment to effect a cure, Novy's treatment could be directed only toward alleviating the worsening condition of his hands since the effects of the x-ray exposure were irreversible. The constant care of a physician during the period in question would not have arrested the deterioration of Novy's hands nor would it have removed Novy's occupational disability. Hence Continental was not injured by Novy's treatment schedule. We therefore conclude that strict compliance with the condition precedent was not a prerequisite to Novy's recovery of indemnity under the occupational disability policy.

ISSUE 7:

Novy raises two issues as cross-appellant.

Novy contends that the trial court erred as a matter of law in not awarding him punitive damages. Novy is thus appealing from a negative judgment and to prevail must show that the evidence leads to but one conclusion and that the trial court has reached the opposite result.

Novy argues that in refusing to pay any indemnity since 1973 Continental has acted in bad faith, thus establishing a basis for an award of punitive damages. Novy points to these facts: That Continental at no time requested a physical examination of Novy be taken, that the only personal contact between insured and insurer was an adjustor's visit to Novy's office in 1973, and that Continental did not attempt to ascertain the nature and extent of Novy's duties performed at the V.A. Hospital.

Thus, Novy contends that Continental did not diligently investigate his claim for benefits, that it did not have sufficient facts upon which to make a good faith determination, that Novy was not disabled under the terms of the policies, and that therefore its conduct was in bad faith and oppressive.

■ An insurer does have a right to disagree as to the amount of recovery, if it does so in good faith. As Judge Neal stated in *First Federal Savings and Loan Assoc. of Indianapolis v. Mudgett* (1979), Ind.App., 397 N.E.2d 1002, 1008:

"Courts have long recognized that a good faith dispute as to what a contract requires of a party will never supply the grounds for punitive damages. *Jones v. Abriani* (1976), Ind.App., 350 N.E.2d 635; that the legitimate exercise of the 'right to disagree' may directly result in intentional infliction of temporal damage; but that the infliction of such damage is generally regarded as privileged. *Vernon* [*Fire & Cas. Ins. Co. v. Sharp* (1976), Ind. 349 N.E.2d 173] *supra.* Courts must be careful not to discourage honest litigation by allowing punitive damages against a party who is merely exercising his right to adjudicate an honest dispute even if he is found to be in error and even if his litigation injures the other party. 8 *Ind. Law Review* 668, *supra.* In *Vernon, supra,* we also stressed that a promisor's motive for breaching his contract is generally irrelevant and that even a breach indicating substandard business conduct does not entitle the promisee to mulct the promisor in punitive damages."

On the other hand, as Judges Buchanan and Garrard have emphasized, punitive damages are appropriate where there is evidence of an independent tort of a 'reprehensible' nature, where the record indicates a state of mind evidencing bad faith, or where the actor's conduct has a quality that characterizes is as 'reprehensible' as where there is evidence of a consciousness of an intended or probable effect calculated to unlawfully injure the personal safety or property rights of others. *Hibschman Pontiac* [*Inc. v. Batche-*

*lor* (1977), Ind., 326 N.E.2d 845] *supra; Vernon, supra.* Such conduct is not privileged."

Novy argues that Continental's doubts as to its liability were unreasonable because it did not fully investigate the facts before it refused to pay.

For authority, Novy cites *Craft v. Economy Fire and Casualty Co.* (7th Cir. 1978), 572 F.2d 565. However, we find that the court in *Craft* refuted the very theory which Novy argues. The court stated:

"However, the Crafts would take this approach one step further. They argue that the insurer is under a duty to promptly investigate the facts underlying an uninsured motorist claim and that a breach of its duty of good faith and fair dealing can be found even where the insurer maintains actual, non-reckless doubts as to its liability, if a reasonable investigation would have disclosed information making those doubts untenable. Not only is there no direct Indiana authority supporting such a proposition, but we believe that in this extreme form the Crafts' contention conflicts with the accepted law that the insured has the burden of showing that the preconditions to the insurance company's obligation to pay have been met. *Couch on Insurance 2d* § 45.628."

572 F.2d 571–72.

Further, in *Nationwide Mutual Insurance Co. v. Neville* (1982), Ind.App., 434 N.E.2d 585, the plaintiff contended that the insurer should have investigated her claim more thoroughly and the failure to do so was grounds for punitive damages. Judge Ratliff stated:

"Second, even assuming the investigation of the claim was below industry standards, negligence cannot be the basis for awarding punitive damages."

434 N.E.2d at 596.

■ Thus a lack of diligent investigation alone is not sufficient to support an award of punitive damages. We also note that the record is unclear as to when Novy first informed Continental that he considered it

in breach of the insurance contract. Continental may not have been aware of any dispute until the filing of the complaint in April of 1977. Thus Novy himself was not overly diligent in making known his demands to Continental at any time prior to the initiation of the lawsuit.

■ Since we have found the trial court's award of general disability benefits to be in error, Continental certainly contested its liability on this policy in good faith. While we have affirmed the trial court's judgment that Novy was entitled to occupational disability benefits, we find the above related evidence supports the trial court's implicit determination that Continental's conduct was not in bad faith or oppressive.

■ At this point another factor must be mentioned. Apart from statute, the award of punitive damages is not a matter of properly compensating a plaintiff. The damages are awarded to punish wrongdoing and deter others from similar conduct. *Hoosier Ins. Co., Inc. v. Mangino* (1981), Ind.App., 419 N.E.2d 978; *Nate v. Galloway* (1980), Ind.App., 408 N.E.2d 1317. As such, their award is a matter of discretion with the fact finder. *Utopia Coach Corp. v. Weatherwax* (1978), Ind.App., 379 N.E.2d 518. Where the fact finder fails to make an award of punitive damages, that decision is subject to review only upon a clear showing of abuse of discretion. No such showing has been here presented.

Lastly, Novy argues that the trial court erred in failing to award prejudgment interest on the amounts past due under the policies. Because the award of benefits under the general disability policy was in error, the remaining issue is whether Novy was entitled to prejudgment interest on the amount owed pursuant to the occupational policy. We note that under the terms of that policy the benefits were payable for no more than 60 months, which ended in November of 1977, according to the trial court. Further, we have found the elimination endorsement to be applicable, limiting benefits to $800 per month. Finally, as the trial court found, Continental is entitled to a credit for the benefits which it had paid

before the trial commenced. Thus, we remand the case to the trial court for the determination of the amount owing under the terms of the occupational disability policy. We also hold that Novy is entitled to prejudgment interest upon that amount.

In *Town & Country Mutual Ins. Co. v. Savage* (1981), Ind.App., 421 N.E.2d 704, Judge Buchanan stated:

"There is a statute in Indiana governing allowance of pre-judgment interest. IC 24–4.6–1–103 provides:

'Interest at the rate of eight percent (8%) per annum *shall* be allowed:

(a) From the date of settlement on money due on *any instrument in writing* which does not specify a rate of interest and which is not covered by IC 1971, 24–4.5 or this article;

(b) And from the date an itemized bill shall have been rendered and payment demanded on an account stated, account closed or for money had and received for the use of another and retained without his consent.'

(Emphasis Added)

"*United Farm Bureau Family Life Insurance v. Fultz* (1978), Ind.App., 375 N.E.2d 601, held this statute is applicable to actions brought on insurance policies. *See also Prudential Insurance Co. of America v. Girton* (1938), 105 Ind.App. 52, 12 N.E.2d 379. The statute is couched in mandatory terms, using the word 'shall,' and subsection (a) requires an 'instrument in writing' in order for interest to be allowable.

'Where the terms of the contract make the claim ascertainable and the amount of the claim rests upon mere computation, pre-judgment interest computed from the time the principal amount was demanded *or due* is allowable at the permissible statutory rate.' *Indiana Telephone Corp. v. Indiana Bell Telephone Co.* (1976), 171 Ind.App. 616, 358 N.E.2d 218, 229. (Emphasis added.) *See also Independent Five and Ten Cent Store v. Heller* (1920), 189 Ind. 554, 127 N.E. 439; *City of Vincennes v. McCarter* (1968), 142

Ind.App. 493, 293 N.E.2d 76. Pre-judgment interest is available when damages 'are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time those damages accrued.' *City of Anderson v. Salling Concrete Corp.* (1980), Ind.App., 411 N.E.2d 728, 735, *trans. denied* April 20, 1981, citing *Rauser v. LTV Electrosystems, Inc.* (7th Cir. 1971), 437 F.2d 800, 805."

421 N.E.2d at 709.

We, however, note Judge Sullivan's concurring opinion in *Savage*, where he questioned the applicability of IC 24–4.6–1–103 in actions brought on insurance policies.

"Notwithstanding *Indiana Telephone Corp. v. Indiana Bell Telephone Co.* (2d Dist. 1976), 171 Ind.App. 661, 358 N.E.2d 218, authored by the writer of this opinion, and *United Farm Bureau Family Life Insurance Co. v. Fultz* (1st Dist. 1978), Ind.App., 375 N.E.2d 601, more recent decisions have persuaded me that allowance of pre-judgment interest under the circumstances present here may not be founded upon IC 24–4.6–1–103 (Burns Supp. 1980). That statute, insofar as here pertinent, provides:

'Interest at the rate of eight percent (8%) per annum shall be allowed:

(a) From the date of settlement on money due on any instrument in writing which does not specify a rate of interest and which is not covered by IC 1971, 24–4.5 or this article.'

The claim of Savage does not arise by reason of the insurance policy before us. Rather, the claim arises because the instrument did not contain the language in writing which would have provided the coverage sought and contemplated. The policy did not cover the loss for which money is now claimed.

Be that as it may, and even if the policy before us were an instrument in writing under which the money is claimed to be due, there was no 'settlement' of the money due until the amount of the loss was established at trial. Accordingly, I must retract from the unmistakable implication of *Indiana Telephone Corp. v. Indiana Bell Telephone Co., supra,* that an unliquidated claim for money may give rise to pre-judgment interest under the statute.

In my view *Urbanational Developers, Inc. v. Shamrock Engineering, Inc.* (3d Dist. 1978), Ind.App., 372 N.E.2d 742 and the more recent 3rd District opinion, *Fort Wayne National Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1332, relying heavily upon *New York, Chicago & St. Louis Ry. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468, make it clear that the statute is unnecessary, if not redundant, in situations in which pre-judgment interest is necessary to fully compensate the plaintiff for the harm or loss claimed.

I concur because pre-judgment interest here is necessary to fully compensate Savage from the date of his loss but not because the pre-judgment interest is authorized by IC 24–4.6–1–103.

In all other respects I concur in the majority opinion." 421 N.E.2d at 710–11.

This court has stated:

"Interest is recoverable in actions in tort where the damages sought to be recovered are complete and ascertainable as of a particular time and in accordance with fixed rules of evidence and known standards of value. *Rauser v. LTV Electrosystems* (7th Cir. 1971), 437 F.2d 800; *Independent Five & Ten Stores of N.Y. v. Heller* (1920), 189 Ind. 554, 127 N.E. 439; *New York, etc. v. Roper* (1911), 176 Ind. 497, 96 N.E. 468; *Indiana Telephone Corp. v. Indiana Bell Telephone Co., Inc.* (1976), 171 Ind.App. 616, 358 N.E.2d 218; *Soft Water Utilities, Inc. v. LeFevre* (1974), 159 Ind.App. 529, 308 N.E.2d 395; *New York Central Railroad Co. v. Churchill* (1966), 140 Ind.App. 426, 218 N.E.2d 372.

The award of interest is founded solely upon the theory that there has been a deprivation of the use of money or its equivalent and that unless interest be added, the injured party cannot be fully compensated for the loss suffered. *New York etc. v. Roper, supra; Grobe v.*

*Kramer* (1942), 178 Misc. 247, 33 N.Y.S.2d 901. Interest is recoverable not as interest but as additional damages to accomplish full compensation. *Ind. Tel. Co. v. IBTC, Inc., supra.*"

*Ft. Wayne National Bank v. Scher* (1981), Ind.App., 419 N.E.2d 1308, 1310–11. .

The facts of the present case do not require us to address this divergence in opinion concerning the grounds for awarding prejudgment interest. Thus, while differing authority exists for awarding prejudgment interest on amounts owed under an insurance contract, it is clear that Novy was entitled to interest on the amount owing under the occupational policy. The final question then is: From what point in time should the interest be computed?

 Novy proposes in his brief that the interest be awarded from the date of the filing of the complaint, April 11, 1977, until the amended judgment on February 22, 1979, on the basis that the record is unclear as to when demands for payment were otherwise made. We agree that since Novy has failed to show from the record that he made a demand earlier than April 11, 1977, the interest on the award under the occupational disability statute should be computed at the statutory rate from this date. Therefore, we remand this case for further proceedings in compliance with this opinion in regard to the amount due under the occupational policy, and we reverse the award of benefits under the general disability policy.

Affirmed in part, reversed in part.

Costs taxed to appellee.

HOFFMAN, P. J., concurs.

STATON, J., concurs in part and dissents in part and files separate opinion.

STATON, Judge, concurring in part and dissenting in part.

I concur with the majority opinion except that part which deals with the award of punitive damages. The authority cited by the majority does not support its position that the insurance company does not have to make any reasonable investigation before suspending payments under a valid claim.[1]

Continental Casualty Company had already recognized the valid claim of Dr. Charles A. Novy and was making regular payments under the provisions of the policy. To suspend or withhold further payments thereafter without a reasonable investigation amounted to oppressive conduct and unilateral conduct in bad faith. Dr. Novy testified that he was transferring his former patients to other doctors so that they could receive proper medical attention. This activity on his part amounted to a winding down and transfer of his practice rather than a continuation of the practice of medicine. *Travelers Ins. Co. v. Sanders* (1933), 47 Ga.App. 327, 170 S.E. 387; *Harasymczuk v. Massachusetts Acci. Co.* (1926), 127 Misc. 344, 216 N.Y.S. 97 (*also see: Murphy v. Travelers Ins. Co.* (1942), 141 Neb. 41, 2 N.W.2d 576).

When Continental Casualty Company acknowledged Dr. Novy's disability as a valid claim under the policy and commenced making payments to him, a presumption is created. The presumption is that the disability continues until there is proof of its discontinuance. The burden of this proof is upon Continental Casualty Company and not Dr. Novy, the insured. In *Aetna Life Insurance Company, Inc., v. Fruchter* (1973), 283 So.2d 36, the Supreme Court held:

"That once the insurer has acknowledged such disability by proceeding to make disability payments under the policy, then in a suit upon a discontinuance thereof and demand for resumption of premium payments, the burden is cast upon the *insurer* to prove that the disability no longer continues." (Emphasis original.)

1. The majority cites *Craft v. Economy Fire and Casualty Co.* (7th Cir. 1978), 572 F.2d 565 and *Nationwide Mutual Ins. Co. v. Neville* (1982), Ind.App., 434 N.E.2d 585. Both of these authorities are concerned with the validity of the initial claim rather than the validity of withholding further payments upon an initially valid claim.

283 So.2d at 37. Continental Casualty had the burden of proof to establish by a preponderance of the evidence that Dr. Novy's disability had discontinued. Upon the pretext that one of its adjusters observed Dr. Novy in his office with patients and without further investigtion, Continental Casualty Company hastily concluded that its obligation to make payments under the policy had ended. This constituted oppressive conduct on the part of Continental Casualty Company; without a reasonable investigation and without meeting the burden of proof that the disability had discontinued, bad faith is presumed.[2] Punitive damages should have been awarded.

Since failure to make a reasonable investigation of the circumstances before suspending payments on a valid claim is per se oppressive and bad faith conduct on the part of Continental Casualty Company, I would reverse the judgment of the trial court as to the award of punitive damages.

**2.** *Also see: Prudential Ins. Co. of America v. Dismore* (1935), 261 Ky. 741, 88 S.W.2d 924; *Couch on Insurance 2d* (1966) § 53:84.